Filed 10/22/21  In re R.C. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re R.C., a Person Coming Under the Juvenile Court Law. | |
| | D079110 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ4611) |
| v. | |
| A.C., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.

A.C. (Mother) appeals dispositional orders entered in juvenile dependency proceedings removing her son, R.C., from her custody pursuant to Welfare and Institutions Code[1] section 361, subdivision (c)(1).  The San Diego County Health and Human Services Agency (the Agency) initiated the dependency proceedings after R.C. was exposed to a domestic violence dispute between Mother and R.C.'s father, R.G. (Father).[2]  Mother contends substantial evidence does not support the juvenile court's dispositional findings.  She also claims the court erred by failing to consider less drastic alternatives when it ordered to remove R.C. from her care.  We reject these challenges and affirm the orders.

## BACKGROUND[3]

Mother began dating Father in 2018.  Prior to their relationship, Father was charged with domestic violence after an altercation with a former girlfriend.  Mother was aware of Father's past domestic violence charge but believed his former girlfriend was just anemic and bruised easily.

R.C. was born in April 2020.  Mother and R.C. lived with the maternal grandparents.  Father lived separately with paternal family members.

On February 18, 2021, Mother and Father had a domestic violence dispute.  According to the police report from the incident, Mother drove to Father's house to confront him about infidelity.  She took then 10-month-old R.C. with her to the confrontation, leaving him downstairs while she and Father argued upstairs.

---

[1]    Further statutory references are to the Welfare and Institutions Code.

[2]    Father is not a party to this appeal.

[3]    "In accord with the usual rules on appeal, we state the facts in the manner most favorable to the dependency court's order." (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1.)

2

Mother reported that during the argument, Father held her face-down on the bed, and she punched him twice in the face. Father's brother, a minor, was upstairs during the fight and heard glass breaking and Mother and Father yelling. He also observed Mother punch Father in the face.

After the initial physical altercation, Mother was able to leave the home with R.C. and placed him in the backseat of her car. On her way out, she threw a rock at Father's car. Father retaliated by throwing a softball-sized rock at her car, shattering the rear passage window while R.C. was inside. Mother then got out of her car and yelled at Father before driving off. When she returned shortly after, Father walked up to her car and hit the driver's side window three times with R.C. inside. Mother eventually drove away.

A neighbor called the police after witnessing the fight. The responding officer observed broken glass on the floor in Father's room, a dent on the hood of his car, and a scratch to the trunk. Father also had a visible scratch on his left wrist and scratches on both elbows. The officer observed that Mother's rear window was broken, and broken glass was scattered inside her car. Following the police investigation, Father was placed under arrest for assault with a deadly weapon.

The Agency received a referral about the parents' February altercation. During an interview with the investigating social worker, Mother denied any prior domestic violence. She claimed that during the recent dispute, she stopped the car after Father shattered the rear window because she realized she had not buckled R.C.'s car seat. However, a security camera that captured the events outside Father's home and a neighbor who witnessed the dispute indicated Mother had stopped the car to prolong the dispute and yelled at Father. Mother also denied the need for a safety plan, custody

3

orders, or a restraining order.  She focused on the fact that "no one got hurt" and claimed R.C. was "fine."  She was worried instead about whether Father would be released from jail.

In Father's interview with the social worker, he reported that Mother had punched him in the face when she was upset four or five times prior to the most recent dispute.  He denied R.C. was present during any of these incidents.  He also did not believe any legal action was necessary to protect R.C.

The Agency created a safety plan for R.C., in which Mother agreed to stay with a friend, have no in-person contact with Father in R.C.'s presence until a child and family team (CFT) meeting could be held, and be assessed by a domestic violence clinician.  A few days later the mother's friend reported Mother left the home with R.C. and was planning to stay with Father.  When confronted by the social worker, Mother denied this was her plan.  However, she asked how long she would have to stay away from Father and asked if she could stay with him if she left R.C. with relatives.  She ultimately agreed to stay with a different friend.

At the CFT meeting, the maternal grandmother reported that the parents had a "volatile relationship," and she often heard them yell at each other over the phone.  A family friend at the meeting confirmed there were problems in the relationship, stating, " 'Many people would agree that the parent[s'] relationship is not healthy.' "  Father also disclosed past arguments where Mother pushed him in the car and forced him to get out of the car. Mother admitted she had pushed him once or twice in the past.  At the meeting, the parents declined voluntary services, which they felt were unnecessary.  The Agency then created a new safety plan for the parents, in

4

which they agreed to reside separately, not have in-person contact, and that the paternal grandmother would help with visitation exchanges.

After completing the investigation, the Agency filed a petition under section 300, subdivision (b)(1), alleging the parents failed or were unable to adequately supervise or protect R.C. The Agency alleged the parents exposed R.C. to a substantial risk of serious physical harm during the domestic violence dispute on February 18.

At the detention hearing on March 1, the juvenile court found a prima facie showing that R.C. was described by section 300, subdivision (b)(1). Both parents were present at the hearing by telephone and represented by counsel.[4] The court detained R.C. with Mother and allowed Father supervised visits on the condition that the parents were not allowed contact with each other. The court stated, "Obviously the mom's not to be the supervisor of [the father's] visits because he cannot–he should have no contact with her. And that will be another condition, that the father have no contact with the mother." The court's written minute order similarly indicated that the conditions for detaining R.C. with Mother included "no contact between the mother and the father." The social worker provided Mother with a copy of the minute order, and she agreed to follow the court's orders.

Following the detention hearing, maternal family members were concerned Mother was violating the court's no-contact order. The maternal grandfather reported Father visited Mother at the maternal grandparents' home, and the visit was captured by the front door security camera. Two of Mother's siblings also observed another visit between the parents that

_____

4    All hearings in these proceedings were conducted remotely via video conference or telephone due to COVID-19 emergency measures.

5

Mother posted on Snapchat. To explain the violation of the no-contact order, Mother's attorney claimed to have incorrectly advised Mother that she and Father were allowed contact with each other so long as it was outside R.C.'s presence. However, one of Mother's siblings also reported viewing pictures on social media of Mother, Father, and R.C. together at the zoo.

When the social worker confronted Mother about the visits, she denied seeing Father in violation of the court orders. She also claimed she was not a victim and that the incident involving domestic violence did not usually happen. She indicated she would follow the no-contact order but indicated it would be difficult.

Mother became eligible to begin domestic violence group therapy the Agency had recommended on April 8, but she did not start attending sessions. She complained the 26-week course was too long, telling the social worker, "I've never been in a domestic violence relationship." She reiterated this to the domestic violence group counselor over the phone, stating, "I've not been in an abusive relationship at all."

At the April 21 pretrial status conference, the juvenile court ordered to remove R.C. from Mother's care and detained him in out-of-home care. The court noted there had been "quite a bit" of what "appears to be mutual combat" between the parents. The court also found Mother's minimization of the domestic violence, refusal to start domestic violence classes, and reluctance to safety plan created a substantial danger to R.C.'s physical or emotional health, particularly given his young age. R.C. was detained with the maternal grandparents, and Mother moved out of the home.

On April 29, Mother began attending group domestic violence classes. She minimized the February altercation during her first session.

At the jurisdiction hearing on May 19, the juvenile court admitted the Agency's reports into evidence, and found the petition true by clear and convincing evidence.

The juvenile court held the contested disposition hearing on June 2. The court agreed to consider the Agency's reports previously admitted at the jurisdiction hearing. The court also admitted Mother's parenting class completion certificate and the curriculum vitae of the social worker assigned to her case.

Mother testified at the hearing that she had attended five domestic violence group sessions. She indicated she had learned how to control her temper and understood the risks of exposing R.C. to domestic violence. She admitted violating the court's no-contact order with Father, but claimed she was not "fully aware" of the conditions of the order and has had no contact with Father since the initial misunderstanding. The maternal uncle, maternal grandfather, and the social worker also testified at the hearing.

After indicating it had considered the evidence and arguments of counsel, the juvenile court ordered to remove R.C. from Mother's custody under section 361, subdivision (c)(1). The court found the February altercation was a "very serious situation where [R.C.] could have gotten seriously hurt." The court further found Mother appeared "manipulative at times," had minimized the domestic violence, and did not demonstrate an interest in changing when the court initially allowed R.C. to remain in her custody. The court expressed doubt Mother had made a "complete characterological change" during the five weeks that had passed since R.C. was removed from her care. The court found the option of placing R.C. with Mother on the condition she live with the maternal grandparents inadequate

7

because "she can put the child in the car and go and do whatever she wants . . . ."

The juvenile court concluded there were no reasonable means to protect R.C.'s physical health without removing him from Mother's physical custody. The court placed R.C. with the maternal grandparents. Mother was provided overnight supervised visits at the home of the maternal grandparents, but she was not permitted to visit every night.

DISCUSSION

Mother's sole challenge in this appeal is to the juvenile court's dispositional order removing R.C. from her custody. She argues the evidence does not support a finding of substantial danger to R.C. if he were returned to her care. She further contends the juvenile court erred by failing to consider less drastic alternatives to R.C.'s removal.

1. *Statement of Law and Standard of Review*

A dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence that there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and there are no reasonable means to protect the child's physical health without removing the child. (§ 361, subd. (c)(1).) At the dispositional stage, the juvenile court may consider a parent's past conduct, present circumstances, and response to the conditions giving rise to the dependency proceedings. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917 (*Cole C.*).) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 135-136 (*T.V.*).) The juvenile court also considers whether there are any reasonable protective

8

measures and services that can be implemented to prevent the child's removal from the parent's physical custody. (§ 361, subd. (c)(1); see §§ 202, subd. (a), 16500.5, 16501, 16501.1.)

The standard of review for a dispositional order is substantial evidence. (*Cole C.*, *supra*, 174 Cal.App.4th at p. 916.) " 'Evidence sufficient to support the [juvenile] court's finding must be reasonable in nature, credible, and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case. [Citation.]' [Citation.] We consider 'the evidence in the light most favorable to respondent, giving respondent the benefit of every reasonable inference and resolving all conflicts in support of the [challenged order]. [Citation.]' " (*In re V.L.* (2020) 54 Cal.App.5th 147, 154 (*V.L.*).) " '[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' " (*Id.* at p. 155, quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.)

2. *Substantial Evidence Supports the Juvenile Court's Dispositional Findings*

Mother contends the record lacks evidence to support the juvenile court's finding of a substantial danger to R.C.'s physical health by remaining in her custody. She claims there was no longer risk at the time of the dispositional hearing because the parents were no longer having contact. She further contends her compliance with the Agency and court's mandates throughout these proceedings demonstrates that R.C. could safely remain in her care.

Substantial evidence supports the juvenile court's finding of a substantial danger to R.C.'s physical or emotional well-being by remaining in Mother's custody. The parents have a history of domestic violence, and the

9

most recent dispute that precipitated these proceedings posed a significant risk to R.C.'s safety. During this incident, R.C. was inside the home when glass was broken, Mother hit Father in the face, and Father held Mother face down on the bed. Then, when the confrontation spilled out into the street, Father shattered the backseat window of Mother's car while R.C. was seated in the backseat. Given R.C.'s young age and proximity to the violence, he was not in a position to protect himself from harm. Mother's decision to bring R.C. with her when she initiated this confrontation therefore created a situation in which her child could have been severely injured.

Evidence in the record indicated the February dispute was not an isolated event but part of a pattern of significant conflict between the parents. Father claimed Mother hit him four or five times prior to the February altercation, and Mother admitted to pushing him during arguments. Family members confirmed the parents had a "volatile relationship" that was not healthy. Additionally, Father had a domestic violence dispute during a prior relationship, which Mother was aware of. Even though R.C. had not yet suffered any physical harm due to domestic violence, a "cycle of violence between the parents constitute[s] a failure to protect [a child] 'from the substantial risk of encountering the violence and suffering serious physical harm or illness from it.' [Citations.]" (*T.V.*, *supra*, 217 Cal.App.4th at p. 135.)

Mother contends domestic violence was no longer a risk to R.C.'s safety because the parents were not in contact at the time of the dispositional hearing. However, evidence in the record indicated the parents' abusive relationship was likely to continue. The parents had been in an on-and-off relationship for several years. In fact, the parents were living separately when the February dispute took place, indicating that their separation would

10

not necessarily prevent further incidents of violence. Mother's conduct during these proceedings also indicated she wanted to remain in contact with Father. For instance, rather than showing concern for R.C.'s safety after the February dispute, Mother was worried about when Father would be released from jail. She also did not feel the need for a restraining order or custody orders. Then after reluctantly agreeing to the Agency's initial safety plan, she wanted to know how long she needed to stay away from Father, and if she could stay with Father without R.C. She also posted on social media about having contact with Father after the detention hearing, which included a visit in R.C.'s presence. "A parent's past conduct is a good predictor of future behavior." (*T.V.*, *supra*, 217 Cal.App.4th at p. 133.) In this case, although the Agency had not received any reports of contact between the parents during the five weeks between the time R.C. was detained and the contested disposition hearing, the juvenile court could reasonably doubt that the parents had permanently ended their abusive relationship. (Cf. *In re I.R.* (2021) 61 Cal.App.5th 510, 521 [history of domestic violence between the parents did not pose a substantial danger to the child, because the father did not live in the family home and had not expressed a desire or willingness to reconcile with the mother].)

Mother's minimization of the harm she created by exposing R.C. to domestic violence further supports the juvenile court's finding of a substantial risk to R.C.'s safety. After the February incident, Mother focused on the fact that "no one got hurt" and claimed R.C. was "fine." The Agency then offered her voluntary services at the CFT meeting, which she declined because she felt the services were unnecessary. She later delayed beginning her domestic violence group therapy sessions, complaining the course was too long and that she was not in an abusive relationship. When she did finally

begin the group therapy, she minimized the February altercation during her first session. Although Mother was still attending sessions at the time of the disposition hearing, her domestic violence treatment provider was opposed to returning R.C. to her care for fear that it could encourage her to stop receiving treatment for domestic violence.

Mother contends the juvenile court improperly relied on her lack of progress in these voluntary services to support its dispositional findings, citing *In re MaV.* (2021) 64 Cal.App.5th 11 (*MaV.*) and *In re Basilio T.* (1992) 4 Cal.App.4th 155 (*Basilio T.*). However, R.C.'s case was not like the situation in *MaV.*, where the juvenile court improperly based the dispositional findings on a lack of verification that the mother was participating in voluntary services. (*MaV.*, at p. 24.) Nor was it like the situation in *Basilio T.*, in which the court failed to state a factual basis for removal. (*Basilio T.*, at pp. 171-172.) Overall, the court in this case was entitled to consider Mother's initial reluctance and then delayed participation in voluntary services in evaluating whether she had gained insight into the danger she created by exposing her child to domestic violence. (See *Cole C.*, *supra*, 174 Cal.App.4th at p. 918 [concluding the parent's failure to accept the Agency's voluntary service referrals supported the juvenile court's dispositional findings]; see also *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge."]; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 601 [the parent's denial of domestic violence and refusal to comply with the Agency's recommended safety plan indicated a continuing risk of exposure to domestic violence].)

Lastly, Mother asserts she was "always forthright" with the Agency throughout these proceedings, which she contends demonstrates that R.C. would be safe in her custody. She blames her attorney for incorrectly

advising that she was allowed contact with Father outside R.C.'s presence under the juvenile court's no-contact order, maintaining that she never "intentionally" violated mandates from the Agency or the court.

These contentions, however, are unsupported by the record. For example, when initially questioned by the social worker about the February altercation, Mother's version of events was contradicted by an eyewitness and security camera footage, which demonstrated she prolonged the dispute. Mother also denied taking R.C. to the zoo with Father, even though a maternal relative viewed her posts about it on social media. Further, this trip to the zoo directly violated the court's order that Mother and Father were not to have contact in R.C.'s presence, an order Mother admits she understood. These incidents show Mother was at times duplicitous during these proceedings, and support the juvenile court's finding that Mother "appear[ed] to be manipulative" and that aspects of her testimony were not credible.

For the foregoing reasons, we conclude substantial evidence supports the juvenile court's finding that R.C.'s removal from Mother's custody was necessary to protect R.C. from further incidents of violence.

3. *Substantial Evidence Supports the Juvenile Court's Finding of No Reasonable Alternatives to R.C.'s Removal*

Mother contends the juvenile court's finding that there were no reasonable means to protect R.C. without removal from her custody was conclusory. She contends that her continued participation in the case plan, unannounced visits by the Agency, and allowing R.C. to reside with Mother in the maternal grandparents' home were reasonable alternatives to removal.

Here, the juvenile court expressly found there were no reasonable means to protect R.C.'s physical health without removing him from Mother's

custody. Contrary to Mother's assertion, the court did consider options other than removal. In particular, the court addressed the option of allowing Mother to reside with R.C. in the maternal grandparents' home, but found this option insufficient because "[Mother] can put the child in the car and go and do whatever she wants . . . ." Indeed, Mother was living with the maternal grandparents when she decided to take R.C. with her to confront Father over infidelity, a decision that gave rise to these proceedings.

Moreover, the alternatives Mother raises on appeal largely replicate the conditions that were in place when the juvenile court allowed Mother to retain custody after the dependency proceedings were initiated. As we have discussed, Mother knowingly violated the court's orders when she visited Father in R.C.'s presence. She also delayed participating in domestic violence classes, despite the social worker's regular contact with her and unannounced visits at the home. On this record, the court was entitled to find that alternatives to removal dependent on Mother's cooperation were not an adequate means of protecting R.C.

Mother's reliance on *In re Ashly F.* (2014) 225 Cal.App.4th 803 (*Ashly F.*) is also unpersuasive. There, the mother physically abused her two children, and the father was largely unaware of the abuse. (*Id.* at p. 806.) The Court of Appeal reversed the dispositional order, concluding there was ample evidence the children could be protected by remaining in the family home with the father who was the nonoffending parent. (*Id.* at pp. 810-811.) Unlike *Ashly F.*, the court determined in this case that both parents had engaged in "mutual combat," and the record shows that Mother admitted to punching Father during their most recent dispute, and she also admitted to pushing him during prior arguments. Additionally, her decision to bring R.C. with her to the confrontation with Father over infidelity created a situation

14

in which R.C. could have been seriously injured.  Thus, in contrast to the circumstances of the nonoffending parent in *Ashly F.*, Mother in this case bore significant responsibility for placing her child at substantial risk of harm.

## DISPOSITION

The juvenile court's findings and orders are affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

GUERRERO, J.